IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02698-PAB-KLM

AHMED ABDEL SATTAR,

      Plaintiff,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,
HARLEY LAPPIN, Director of the Federal Bureau of Prisons,
HARRELL WATTS, Administrator of National Inmate Appeals for
the Federal Bureau of Prisons,
BLAKE DAVIS, Warden, the United States Penitentiary –
Administrative Maximum,
UNKNOWN FBI AGENTS 1-5,
MICHAEL NALLEY, Regional Director, North Central Region, and
JOHN DOES 1-5,
sued in their official capacity,

      Defendants.

---

## ORDER

---

This matter comes before the Court on the Motion to Dismiss Plaintiff's Second Amended and Supplemental Complaint [Docket No. 203] filed by defendants and the Motion to Strike References to Improper Extrinsic Evidence in Defendants' Motion to Dismiss [Docket No. 214] filed by plaintiff.  The motions are fully briefed and ripe for disposition.  The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

Plaintiff Ahmed Abdel Sattar is a prisoner in the custody of the Federal Bureau of Prisons ("BOP") serving a 24-year sentence for conspiracy to murder in a foreign country and solicitation of a crime of violence.  Since December 2006, plaintiff has been detained at the United States Penitentiary – Administrative Maximum ("ADX") facility in Florence, Colorado.  From the time of his arrest in April 2002 until December 2006, plaintiff was detained at the BOP's Metropolitan Correctional Center ("MCCNY") in New York, New York.  While incarcerated at MCCNY, plaintiff "had all of the privileges and rights offered to other inmates," Docket No. 197 at 6, ¶ 14, until February 2, 2006, when he was transferred to MCCNY's most restrictive ward.

On February 2, 2006, plaintiff was informed that the defendant Attorney General of the United States[2] had instructed defendant Harley Lappin, Director of the Federal Bureau of Prisons, to implement Special Administrative Measures ("SAMs").  Plaintiff

_____

[1]The following facts are drawn from plaintiff's complaint.  *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff").  The Court has also relied upon the May 19, 2011 Amended Notification of Extension of Special Administrative Measures [Docket No. 197-4], which plaintiff attached to his complaint.  *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (providing that when resolving a motion to dismiss pursuant to Rule 12(b)(6) a court may consider, in addition to the allegations of the complaint, "(1) documents that the complaint incorporates by reference, (2) 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and (3) 'matters of which a court may take judicial notice.'"(citations omitted).  Because the Court resolves the present motion on that record, and plaintiff "does not dispute that the documents attached to his Complaint may properly be considered in the context of Defendants' Motion," Docket No. 214 (Pl.'s Mot. to Strike) at 4, the Court will deny plaintiff's motion to strike as moot.

[2]In February 2006, the Attorney General of the United States was Alberto Gonzales.  The current Attorney General is defendant Eric H. Holder, Jr.

was informed that the SAMs were implemented "based on information of [plaintiff's] proclivity for violence."  Docket No. 197 at 7, ¶ 19.  The SAMs took effect as of February 2, 2006 and were to remain in effect for one year.  On December 19, 2006, plaintiff was transferred to ADX, a federal "supermax" facility.  At ADX, inmates are housed in solitary confinement and are subject to highly restrictive conditions.  SAMs inmates are detained in a "super restrictive" area of ADX, Docket No. 197 at 8, ¶ 22, called the H-Unit.

The Attorney General has authorized extending the SAMs upon their expiration each year and, as a result, the SAMs remain in place.  Upon the extensions of the SAMs in previous years, plaintiff contends that he did not receive notice of the factual basis for their imposition.  On May 19, 2011, however, plaintiff received an Amended Notification of Extension of Special Administrative Measures.  Docket No. 197-4.[3]  The Amended Notification informed plaintiff that the government had "determined that there is a substantial risk that your communications or contacts could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."  *Id.* at 1-2.

The current SAMs restrict plaintiff's interactions with other inmates.  Prison officials "may permit [plaintiff] to communicate with other SAMs inmates orally only during certain predesignated times" determined by prison officials.  *Id.* at 3, § 1.c.ii. Plaintiff may not share a cell with another inmate and is not permitted to "communicat[e]

---

[3]Plaintiff seeks exclusively injunctive relief against defendants in their official capacities.  *See Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) ("Plaintiffs seeking prospective relief must show more than past harm or speculative future harm.").

with any other inmate by making statements audible to other inmates or by sending notes to other inmates," except during the aforementioned predesignated times for interacting with other inmates.  *Id.* at 12, § 6.  While in the cellblock area, plaintiff is "kept separated from other inmates as much as possible" and is not supposed to communicate with other inmates.  *Id.* at 12, § 7.  Moreover, plaintiff is not permitted to engage in prayer with other inmates.  *See id.* at 12, § 5.a.

The SAMs also place restrictions on plaintiff's communications with the outside world.  Plaintiff's nonlegal[4] telephone calls are limited to his immediate family members, who are defined as plaintiff's "spouse, natural children, parents, and siblings."  *Id.* at 8, § 3.a.i. and n.7 ("Requests for additional nonlegal contacts may be submitted on a case-by-case basis.").  Plaintiff is guaranteed a minimum of one call per month to his immediate family members.  *See id.* at 8, § 3.a.ii.  All telephone calls are contemporaneously monitored and recorded.  *See id.* at 9, § 3.d.[5]  As for nonlegal visitors, plaintiff is "permitted to visit only with [his] immediate family members."  *Id.* at 10, § 3.f.i.[6]  The nonlegal visits are also contemporaneously monitored.[7]

---

[4]There are separate rules governing plaintiff's legal communications.  *See* Docket No. 197-4 at 4-8, § 2.

[5]Telephone calls must occur in English unless an approved interpreter is available to monitor the call.  *See* Docket No. 197-4 at 9, § 3.b.iv.

[6]Conversations during these visits must also take place in English unless an interpreter is available.  *See* Docket No. 197-4 at 10, § 3.f.ii.

[7]Plaintiff alleges that he is permitted to meet with clergy, "such as Muslim *imams*."  Docket No. 197 at 17, ¶ 66 (alleging that the meetings must occur "when both cell doors are closed and the clergy is standing outside in the hallway, thus requiring the Plaintiff to speak at a volume so loud as to render private consultations with the *imam* impossible" and that, to have a conversation with the cell door open, a prison official

The SAMs also impose restrictions on plaintiff's receipt of mail.  Plaintiff's nonlegal mail is restricted to his immediate family members.  *See id.* at 10, § 3.g.i.  "Volume and frequency of outgoing general correspondence with immediate family members may be limited to three . . . pieces of paper (not larger than 8 ½ x 11), double sided, once per calendar week to a single recipient . . . ."  *Id.* at 10-11, § 3.g.i.  Plaintiff's nonlegal mail is copied, forwarded to the FBI, and analyzed before being delivered to its destination.  *See id.* at 11, § 3.g.iii.  According to the SAMs, the analysis may take (1) a "reasonable time not to exceed fourteen business days for mail which is written entirely in the English language"; (2) a "reasonable time not to exceed sixty business days for any mail which includes writing in any language other than English, to allow for translation"; or (3) a "reasonable time not to exceed sixty business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding."  *Id.* at 11, § 3.g.iv.  Plaintiff alleges that such analysis results in delays in the delivery of mail in English of "up to four months or more" and of longer periods of time for non-English mail.  Docket No. 197 at 8, ¶ 24.

Plaintiff's access to reading material is subject to certain restrictions as well.  Plaintiff is permitted access to "publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public."  Docket No. 197-4 at 13, § 9.a.i.  Similarly, plaintiff "may have access to all books which do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the

_____

must be present).

institution." *Id.* at 14, § 10.a.  Plaintiff has access to a television and radio.  *See id.* at 13, § 9.b.

Plaintiff alleges that, since having been incarcerated, he has not encouraged or condoned violence in any way.  Nor has plaintiff ever been found to have violated prison rules or regulations.

## II.  STANDARD OF REVIEW

Plaintiff argues that defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) impermissibly relies upon extrinsic evidence and, therefore, to the extent the Court will consider such evidence, the motion should be converted into a motion for summary judgment.  *See* Docket No. 213 at 2 & n.1.  As noted above, however, *see supra* n.1, the Court has limited its review to plaintiff's complaint and the May 2011 notice of the current SAMs, which is attached thereto.  *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citations omitted).  Consequently, the motion properly may be resolved pursuant to Rule 12(b)(6).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's Complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted).  In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted).  At the same time, however, a court need not accept conclusory allegations. *Moffett v.*

6

*Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (omission marks, internal quotation marks, and citation omitted).  The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible.  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009) (internal quotation marks and alteration marks omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

Those allegations need to account for the context of the claims as well.  *See Gee*, 627 F.3d at 1185 ("*Iqbal* establishes the importance of context to a plausibility determination.").  "Nowhere in the law does context have greater relevance to the validity of a claim than prisoner civil-rights claims," because "the Supreme Court has repeatedly recognized that the role of the Constitution within their walls is quite limited." *Id.*  "Consequently, a prisoner claim will often not be plausible unless it recites facts that might well be unnecessary in other contexts.  For example, . . . a prisoner claim may

not be plausible unless it alleges facts that explain why the usual justifications for the complained-of acts do not apply." *Id.*

## III.  DISCUSSION

### A.  First Amendment

Plaintiff alleges that the SAMs violate his First Amendment rights by unreasonably delaying the delivery of his mail, by circumscribing the relatives with whom he may have contact, and by preventing him from consulting with a religious representative and from engaging in group prayer.[8]

### 1.  Delayed Mail

Plaintiff alleges that "mail to his immediate family, both incoming and outgoing, must be routed through Defendant Unknown FBI Agents for translation and analysis" thus resulting "in delays of up to four months or more for English mail and non-English mail takes even more" time.  Docket No. 197 at 8, ¶ 24 ("[I]t takes months and months to exchange a letter in English with the Plaintiff's wife and children in the United States.").  Defendants contend that plaintiff fails to adequately allege a violation of the First Amendment arising from delays in the delivery of his mail.

The "First Amendment protects a prisoner's right to receive mail."  *Frazier v. Ortiz*, 417 F. App'x 768, 773 (10th Cir. 2011) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)).  "Correspondence between a prisoner and an outsider implicates the

---

[8]Although plaintiff's complaint contains allegations regarding restrictions on the publications he may receive, he does not rely upon those allegations in responding to defendants' motion to dismiss, *see* Docket No. 213 at 5 (identifying the paragraphs describing First Amendment violations), or address whether the restrictions on his reading material imposed by the current SAMs implicate the First Amendment.

8

guarantee of freedom of speech under the First Amendment and a qualified liberty interest under the Fourteenth Amendment." *Treff v. Galetka*, 74 F.3d 191, 194 (10th Cir. 1996). Regulation of a prisoner's communications, however, is permissible so long as it is "'reasonably related to legitimate penological interests.'" *Thornburgh*, 490 U.S. at 409 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see Turner*, 482 U.S. at 89.

The Supreme Court in *Turner* outlined factors courts should consider when determining whether a restriction is reasonably related to legitimate penological interests. *See Turner*, 482 U.S. at 89-91. Applied to the context of this case, the Court must address

> (1) whether a rational connection exists between the SAMs and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the SAMs; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Mohammed v. Holder*, No. 07-cv-02697-MSK-BNB, 2011 WL 4501959, at *7 (D. Colo. Sep. 29, 2011) (citing *Turner*, 482 U.S. at 89-91). These *Turner* factors are highly fact-intensive and, therefore, commonly cannot be adequately addressed until the summary judgment stage. *See, e.g.*, *Al-Owhali v. Mukasey*, No. 07-cv-02214-LTB-BNB, 2010 WL 5651033, at *11 (D. Colo. June 17, 2010) ("This analysis requires facts that are not properly before the court on a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P."); *see also Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) ("*Turner* thus requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in

determining whether prisoners' constitutional rights maybe curtailed."); *Monroe v. Beard*, 2007 WL 764086, at *13 (E.D. Pa. March 7, 2007) (noting that, while "[c]hallengers of the regulation have the ultimate burden of persuasion that the policy is unreasonable and fails step one of the *Turner* analysis," the government "must provide a government interest that justifies the regulation and 'demonstrate that the policy drafters could rationally have seen a connection between the policy and that interest'").

The government points out that it has a legitimate penological interest in monitoring plaintiff's mail.  *Cf.* Docket No. 203 at 22 ("The facts the Court can consider show that the government has legitimate interests in establishing a special communications monitoring structure for Plaintiff.").  However, the issue raised in this claim is not the government's penological interest in monitoring plaintiff's mail, but rather whether the delay attendant to such monitoring violates the First Amendment.  In fact, plaintiff does not argue that any and all delays in delivering his mail are impermissible.  *Cf. Gee*, 627 F.3d at 1190 (10th Cir. 2010) (finding that "brief delays in mailing" are insufficient to violate the First Amendment); *Bruscino v. Pugh*, 232 F. App'x 763, 766 (10th Cir. 2007) (three-week delay did not implicate First Amendment). Rather, plaintiff alleges that a multi-month delay is unreasonable.  The government's discussion of the *Turner* factors does not explain why the length of delay in this case passes constitutional muster as a matter of law.  Therefore, the Court will deny the government's motion to dismiss this aspect of plaintiff's First Amendment claims.  *See Saleh v. United States*, No. 09-cv-02563-PAB-KLM, 2011 WL 2682728, at *5 (D. Colo. July 8, 2011) (concluding a "delay of up to four to six months" to be "sufficient to state a

First Amendment claim for injunctive relief").

## 2. *Restriction on Communications with Certain Family Members*

Plaintiff alleges that the "SAMs unreasonably and unnecessarily cut the Plaintiff off from his immediate and extended family in Egypt and the United States" because he "is not allowed to communicate by mail or phone with his nieces or nephews or his aunts and uncles."  Docket No. 197 at 9, ¶ 25 ("He is not even allowed to call his brother and sisters in Egypt."); *cf. Thornburgh*, 490 U.S. at 407 ("Access is essential . . . to families and friends of prisoners who seek to sustain relationships with them.").  The government again argues that it is reasonable to restrict the individuals with whom plaintiff interacts.  Plaintiff does not contend otherwise.  Rather, he alleges that he is cut off from certain family members but not others without adequate justification.  The government does not identify the basis in the record for limiting communications with these particular family members.[9]  Because plaintiff alleges facts that could support the inference that the restriction is not reasonably related to the proffered penological interest, the Court finds that plaintiff's First Amendment claim survives on this basis as well.  *See Boles v. Neet*, 486 F.3d at 1181 ("[T]he first *Turner* factor is actually more of

---

[9]*See Mohammed v. Holder*, No. 07-cv-02697-MSK-BNB, 2011 WL 4501959, at *8 (ruling on a motion for summary judgment):

> There is no dispute that maintaining prison security and preventing advocacy of violence and radicalism both inside and outside the prison are legitimate governmental interests.  Appropriate allocation of prison and other governmental resources is also a legitimate interest.  However, because the SAMs at issue are individually crafted to address the risk associated with Mr. Mohammed, the question is not whether SAMs, generally, are rationally related to a penological objective, but instead whether the Government has shown that there is a rational connection between the particular SAMs applied to Mr. Mohammed and a penological objective.

an "element" than a factor in the sense that it 'is not simply a consideration to be

weighed but rather an essential requirement.'") (citation omitted).[10]

### 3.  Free Exercise

Plaintiff alleges that the "SAMs forbid [him], . . . a Muslim, from participating in

group prayer — including the Friday *Jumu'ah* prayer that must be performed in

congregation" and that he "has not received any counseling from an Islamic

representative since the imposition of the SAMs."[11]  Docket No. 197 at 10, ¶ 29;

*see* Docket No. 197 at 17, ¶ 66 (alleging that he is "forbidden from engaging in group

prayer, such as the Muslim *Jumu'ah* prayer, the five daily prayers, and special night

prayers during the month of Ramadan and two major Muslim holidays").  "Under the

First . . . Amendment[], inmates are entitled to the reasonable opportunity to pursue

their sincerely-held religious beliefs."  *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th

Cir. 2009).  To state a free exercise claim, plaintiff

> must first show that a prison regulation "substantially burdened . . .
> sincerely-held religious beliefs."  Consequently, "[t]he first questions in any
> free exercise claim are whether the plaintiff's beliefs are religious in nature,
> and whether those religious beliefs are sincerely held."  Second, prison
> officials-defendants may "identif[y] the legitimate penological interests that

---

[10]*Cf. Mohammed*, 2011 WL 4501959, at *9 (when addressing the second factor at the summary judgment stage, noting that plaintiff was not permitted to "communicate by telephone, writing, or personal visit with anyone other than the specified persons approved by his SAMs and so a jury could find that alternative modes of communication with his family and community are not available").

[11]Later in the complaint, however, plaintiff alleges that he is permitted to meet with clergy, "such as Muslim *imams*."  Docket No. 197 at 17, ¶ 66 (alleging that the meetings must occur "when both cell doors are closed and the clergy is standing outside in the hallway, thus requiring the Plaintiff to speak at a volume so loud as to render private consultations with the *imam* impossible" and that, to have a conversation with the cell door open, a prison official must be present).

justif[ied] the impinging conduct."

*Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (citations and footnote omitted).

"The burden then returns to the prisoner to 'show that these articulated concerns were

irrational.'" *Id.* at 1218 n.2 (citation omitted).  To determine the reasonableness of the

regulation "[a]t that point, courts balance the factors set forth in *Turner*[.]"  *Id.* at 1218.

Although this analysis often requires a more fully-developed record,[12] plaintiff has

failed to allege that the "logical connection" between the restrictions on group prayer

and "the asserted goal is so remote as to render the policy arbitrary or irrational."

*Turner*, 482 U.S. at 89-90.  Plaintiff also has failed to allege facts supporting the

inference that he is denied the reasonable opportunity to pursue his sincerely-held

religious beliefs.  As a result, plaintiff fails to state a claim.  As the Tenth Circuit stated

in *Gee*, a plaintiff

> has to plead sufficient factual allegations "to raise a right to relief above the
> speculative level."  He must do more than plead facts that establish "a
> sheer possibility that a defendant has acted unlawfully," or "facts that are
> merely consistent with a defendant's liability."  Because *Turner* allows
> prohibitions and restrictions that are reasonably related to legitimate
> penological interests, [a plaintiff] must include sufficient facts to indicate the
> plausibility that the actions of which he complains were *not* reasonably
> related to legitimate penological interests.  This is not to say that [a plaintiff]
> must identify every potential legitimate interest and plead against it . . . .  It
> is sufficient that he plead facts from which a plausible inference can be
> drawn that the action was not reasonably related to a legitimate penological
> interest.

627 F.3d at 1187-88 (emphasis in original).

---

[12]*See Gee*, 627 F.3d at 1185 ("One of the chief concerns of critics of [*Iqbal*'s
plausibility standard] is that plaintiffs will need discovery before they can satisfy
plausibility requirements when there is asymmetry of information, with the defendants
having all the evidence.  But prisoners claiming constitutional violations by officers
within the prison will rarely suffer from information asymmetry.").

Here, plaintiff merely identifies the ban on group prayer and describes the restrictions on his meetings with a religious representative.  Although he is not required to address all potential interests the government might choose to identify, plaintiff has failed to plead facts indicating that the restrictions are not reasonably related to even those penological interests identified in his SAMs.  *See* Docket No. 197 at 14, ¶ 53 (referencing the May 2011 SAMs notice); *see also* Docket No. 197 at 14, ¶¶ 52 (quoting 28 C.F.R. § 501.3, the regulation outlining the criteria for imposing SAMs); Docket No. 197-4 at 1-2.  It is not enough for plaintiff to simply identify a significant restriction given that the same plausible inferences that might attach outside the prison context are not equally applicable within it.  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) ("Context matters in notice pleading.") (quotation marks, ellipsis, and citation omitted).  "[P]risoners' rights may be restricted in ways that 'would raise grave First Amendment concerns outside the prison context.'" *Gee*, 627 F.3d at 1187 (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)).  Because plaintiff alleges no facts "that explain why the usual justifications for the complained-of acts do not apply," *Gee*, 627 F.3d at 1185, the Court will dismiss his free exercise claim.

### B.  Fifth Amendment

Plaintiff asserts procedural due process claims pursuant to the Fifth Amendment. The Court "examine[s] procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the [government]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490

U.S. 454, 460 (1989) (internal citations omitted).

With respect to the first step – the existence of a liberty interest – "prison conditions that 'impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' may create a liberty interest protected by the Due Process Clause." *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)) (internal alteration marks omitted).  The Supreme Court has set the baseline for what constitutes an atypical and significant hardship in relation to the ordinary incidents of prison life.  In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court concluded that the specific combination in that case of certain severe limitations in solitary confinement, indefinite placement, and an impact on the inmates' eligibility for parole constituted an atypical and significant hardship in relation to the ordinary incidents of prison life.  In applying the *Wilkinson* decision to a particular set of facts, a court "might" consider whether "the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation"; whether "the conditions of placement are extreme"; whether "the placement increases the duration of confinement, as it did in *Wilkinson*"; and whether "the placement is indeterminate." *Estate of DiMarco v. Wyoming Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007).[13]

_____

[13]Plaintiff argues that, because his Fifth Amendment claim survived defendant's first motion to dismiss, it should also survive the present motion pursuant to the law of the case doctrine.  The Court, however, is being asked to address the sufficiency of the now-operative pleading in light of the current state of the law. *Cf. Saleh v. Federal Bureau of Prisons*, Nos. 05-cv-02467-PAB-KLM, 06-cv-01747-PAB-KLM, 07-cv-00021-PAB-KLM, 2010 WL 5464295, at *13 (D. Colo. Nov. 23, 2010) ("Arguably, given the recent jurisprudence in this District on this issue, an ADX inmate's conditions of confinement claim can no longer survive a motion to dismiss unless those conditions

### 1. Legitimacy of Penological Interest

Plaintiff contends that there is no legitimate penological interest supporting the restrictions imposed upon him because there is no "nexus" between the SAMs and any behavior by plaintiff since his incarceration.  *See* Docket No. 213 at 10-11 ("Specifically, Mr. Sattar: (a) is not a threat to others, nor the secure and orderly operation of ADX; (b) has never demonstrated, since his confinement, proclivity for violence or engaged in prohibited behaviors; and (c) has no knowledge of or involvement in any terrorist activity subsequent to the activities for which he was originally convicted.").  As an initial matter, the Court notes that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."  *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (overruled on other grounds by *Sandin*, 515 U.S. at 479-83); *cf. Deberry v. Davis*, No. 10-cv-00725-CMA-BNB, 2011 WL 1258509, at *3 (D. Colo. March 31, 2011) ("Although the transfer from the D/B Unit to the General Population arguably was not in furtherance of a legitimate penological interest, 'the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence.'") (quoting *Hewitt*, 459 U.S. at 468 (1983)).

Furthermore, the penological interest need not be related only to post-incarceration conduct.  Prison officials are permitted to consider the nature of the

---

deviate substantially from those at issue in the prior cases."), *accepted by* 2010 WL 5464294 (D. Colo. Dec. 29, 2010); *see also McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1262 (D. Colo. 2011).

underlying crime for which a prisoner was convicted.  *See McMillan v. Wiley*, 813 F.

Supp. 2d 1238, 1248 (D. Colo. 2011) ("Plaintiff's criminal history supports his placement

at the ADX based on a legitimate penological interest."); *Allmon v. Wiley*, No. 08-cv-

01183-MSK-CBS, 2011 WL 4501941, at *13 (D. Colo. Aug. 25, 2011) ("[T]he evidence

shows that Mr. Allmon's criminal history supported his placement in H Unit at ADX in

November 2007, based on legitimate penological interests of safety and security for

persons both inside and outside the ADX."); *Rezaq v. Nalley*, No.

07-cv-02483-LTB-KLM, 2010 WL 5157317, at *8 n.6 (D. Colo. Aug. 17, 2010) (Mag. J.

Recomm.) ("Considering that an inmate can be designated to ADX at the outset of his

sentence, it cannot be reasonably argued that an inmate's conviction and background

alone could not provide a basis for his placement there."), *accepted by* 2010 WL

5157313 (D. Colo. Dec. 14, 2010).[14]

    In this case, the SAMs imposed on plaintiff relate to the prevention of

communications that could threaten national security.  Moreover, plaintiff's underlying

conviction arises out of assisting a federal inmate, Sheikh Omar Abdel Rahman, to

evade SAMs in order to exercise leadership over a violent terrorist group.  The May 19,

2011 SAMs indicate that Rahman has attempted to have his family contact plaintiff's

family and that the FBI has concerns that "Rahman's sons may try to reestablish

communication with [plaintiff] while [plaintiff is] imprisoned."  Docket No. 197-4 at 2

("Although the attempted contact by a third party is not a SAM violation on [plaintiff's]

---

[14]*But see Allmon v. Bureau of Prisons*, No. 08-cv-01183-ZLW-CBS, 2010 WL
2163773, at *5 (D. Colo. May 26, 2010) ("[I]f Plaintiff's underlying convictions alone
necessitated his placement at ADX, Defendants have, at this point, provided no
explanation or evidence addressing why he was not placed at ADX initially.").

part, it does indicate that [plaintiff] remain[s] in a position to motivate and inspire others who share [his] extremist and violent views."); *cf. Saleh v. Federal Bureau of Prisons*, Nos. 05-cv-02467-PAB-KLM, 06-cv-01747-PAB-KLM, 07-cv-00021-PAB-KLM, 2010 WL 5464294, at *4 (D. Colo. Dec. 29, 2010) ("[P]laintiffs argue that their transfers could not have served a legitimate penological interest because, unlike most prisoners transferred to ADX, they were able to safely function in less restrictive environments. However, the threat posed by plaintiffs was not that they might act out in prison, but that, following September 11, they might contact individuals on the outside and therefore posed a threat to national security.") (citations omitted).  Even assuming plaintiff could eventually demonstrate, based on the available evidence, that the SAMs do not further those interests when applied to him, the Court finds that, weighed against the other relevant factors, plaintiff has failed to allege that a liberty interest is implicated by the conditions of his confinement.

### 2.  Extremity of Conditions

In regard to the extremity of the conditions of his confinement, plaintiff alleges that the "SAMs unreasonably and unnecessarily cut the Plaintiff off from his immediate and extended family in Egypt and the United States," because "[h]e is not allowed to communicate by mail or phone with his nieces and nephews or his aunts and uncles" and "is not even allowed to call his brother and sisters in Egypt."  Docket No. 197 at 9, ¶ 25.  Plaintiff alleges that his only permitted newspaper subscription is USA Today and "only after the edition is 30 days old and censored by Defendants Unknown FBI

Agents." Docket No. 197 at 9, ¶ 26.[15]  Furthermore, as discussed in relation to his First Amendment claim, plaintiff's mail is reviewed, resulting in long delays in its delivery. The SAMs also prevent plaintiff from engaging in group prayer.[16]  Plaintiff, however, is permitted to communicate with other inmates during designated times.  *See* Docket No. 197 at 17-18, ¶ 66 ("The Plaintiff's outside recreation facilities consist of a yard with six individual cages in which he is next to and can talk to other inmates.").

Plaintiff has not identified any instance where a court in the Tenth Circuit has held that conditions such as these at ADX, regardless of the unit, are extreme.   At the summary judgment stage, courts have not concluded that conditions imposed at ADX are atypically extreme. *See, e.g.*, *Jordan v. Federal Bureau of Prisons*, 191 F. App'x 639, 651–52 (10th Cir. 2006) (finding no liberty interest in conditions imposed during five-year administrative confinement in the ADX control unit); *Saleh v. Federal Bureau of Prisons*, Nos. 05-cv-02467-PAB-KLM, 06-cv-01747-PAB-KLM, 07-cv-00021-PAB-KLM, 2010 WL 5464294 (D. Colo. Dec. 29, 2010) (no liberty interest in conditions imposed in the ADX general population unit); *Georgacarakos v. Wiley*, No. 07-cv-01712-MSK-MEH, 2010 WL 1291833, at *11-13 (D. Colo. March 30, 2010) (finding no liberty interest in conditions imposed in the ADX general population unit); *Rezaq v. Nalley*, No. 07-cv-02483-LTB-KLM, 2010 WL 5157317, at *14 (D. Colo. Aug. 17, 2010)

---

[15]Plaintiff's most recent SAMs do not appear to limit him to a single newspaper. *See* Docket No. 197-4 at 13, § 9(a)(i).

[16]Plaintiff alleges that the SAMS forbid him from watching television or listening to the radio and from talking with other inmates.  Plaintiff's most recent SAMs, which he attached to his complaint, indicate that he is "authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures."  Docket No. 197-4 at 13, § 9(b).

(conditions in the ADX general population unit do not implicate a liberty interest); *Allmon v. Wiley*, No. 08-cv-01183-MSK-CBS, 2011 WL 4501941, at *15 (D. Colo. Aug. 25, 2011) (Magis. J. Recomm.) ("Given the lack of any substantial differences between conditions of confinement in H Unit and in ADX general population and administrative segregation units, Mr. Allmon was not subjected to conditions that impose atypical and significant hardship and thus give rise to a constitutionally-protected liberty interest."), *adopted by* 2011 WL 4501937 (D. Colo. Sep. 27, 2011).

The only specific differences plaintiff identifies between his conditions and those of prisoners in general population at ADX are (1) that his cell does not contain a shower, *see* Docket No. 197 at 16 ("[R]ather, he must use the communal shower located within the range."), and (2) that, in some unspecified way, his "library access, commissary access, television and radio access, and restrictions upon family and legal visits are subject to significantly greater restrictions in H-Unit than the ADX general population." Docket No. 197 at 17, ¶ 66; *cf.* Docket No. 197-4 at 13, § 9(b) ("authoriz[ing plaintiff] to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures"). The Court does not find that these differences render his conditions materially more extreme than those imposed on prisoners in the general population, conditions which have repeatedly been found to fall short of implicating a liberty interest. *See Allmon v. Wiley*, No. 08-cv-01183-MSK-CBS, 2011 WL 4501941, at *15 (D. Colo. Aug. 25, 2011) ("Among Mr. Allmon's complaints are: the commissary list for H Unit inmates is more restrictive than the list for general population inmates; the H Unit hours for visits,

making telephone calls and using the library are not convenient; the reading materials for H Unit inmates are more restricted than those for general population inmates; H Unit inmates receive two showers per week; recreation for H Unit inmates occurs early in the morning; H Unit inmates are restrained and searched when they leave their cells; and H Unit inmates do not have color televisions in their cells.  Mr. Allmon's complaints about H Unit are minor matters of degree.  He does not show any significant difference between the conditions of confinement in H Unit and other ADX units that courts have considered in finding no protected liberty interest.") (citation omitted); *cf. Mohammed v. Holder*, No. 07-cv-02697-MSK-BNB, 2011 WL 4501959, at *12 n.25 (D. Colo. Sep. 29, 2011) ("Defendants have presented undisputed evidence to show that the general conditions of confinement in the H Unit (as distinguished from SAMs restrictions) are not significantly different from those of the ADX general population."); *cf. Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010) ("[Plaintiff's] generalized and conclusory allegations of the conditions of confinement do not state that he is subject to different conditions than any other inmate at ADX or different conditions than those that have been determined not to impose atypical or significant hardship.").  Therefore, the Court finds that this factor weighs against finding a liberty interest.

### 3.  Placement's Impact on Duration of Incarceration

Plaintiff does not contend that either his placement at ADX or the SAMs increase the duration of his sentence, a relevant factor in *Wilkinson*.  *See* 545 U.S. at 223-24 (noting that parole disqualification elevated restrictive conditions beyond those ordinarily experienced by prisoners in solitary confinement to those giving rise to

constitutional protection).  This weighs against finding that plaintiff has adequately alleged a liberty interest.

### 4.  Indefiniteness of Placement

Plaintiff alleges that, because of the SAMs, he is not permitted to complete the H-Unit Special Security Unit Program, which provides a path to return to ADX's general population, and he is prevented from accessing ADX's Step-Down Unit Program, which offers steps by which an inmate can become eligible to transfer out of ADX.  *See* Docket No. 197 at 18, ¶ 68.  The SAMs, however, are not indefinite.  A determination that an inmate must be subject to SAMs is good for no longer than a year.  *See* 28 C.F.R. § 501.3(c).  In order for SAMs to last longer than one year, such as in this case, they must be renewed in increments no longer than an additional one year, *see id.*, and the "affected inmate may seek review of any special restrictions . . . through the Administrative Remedy Program."  28 C.F.R. § 501.3(e).  Plaintiff argues that, because the Attorney General makes the decision regarding SAMs, review pursuant to the BOP Administrative Remedy Program is not meaningful review.  As the Court in *Mohammed* concluded in addressing the adequacy of the process afforded at step two of the procedural due process analysis, "[i]mplicit in [that] position is the belief that his comments are not conveyed to the decisionmaker."  2011 WL 4501959, at *12. "The record is somewhat unclear in this regard but does establish that the inmate's input is transmitted to all the relevant agencies.  Therefore, regardless of which agency has the ultimate decisionmaking authority, there is adequate process."  *Id.*

Here, plaintiff's most recent notification regarding the renewal of his SAMs, as in

*Mohammed*, "sets forth the reasons for the determination to continue the restrictions, including the facts specific to [plaintiff]." *Id.* And, while plaintiff contends that he received no explanation for the imposition of the SAMs, *cf. Mohammed*, 2011 WL 4501959, at *12 (concluding, in context of step two analysis, that such a summary was not "required under these circumstances."), he has now received an explanation pursuant to the May 19, 2011 notice. Furthermore, "neither an inability to participate in the Special Security Unit Program nor ineligibility for the Step-Down Program for ADX general population inmates shows that the conditions in H Unit deprived him of a protected liberty interest." *Allmon*, 2011 WL 4501941, at *15 (citing *Bradshaw v. Lappin*, 738 F. Supp. 2d 1143, 1155 (D. Colo. 2010) (finding no liberty interest associated with loss of access to ADX step-down program)); *see Muhammad v. Hood*, 100 F. App'x at 783 (concluding that removal of inmate from stepdown program to more restrictive unit does not create a liberty interest)).

Plaintiff further points out that the "duration of a prisoner's segregation is a central factor in determining whether a deprivation is atypical and significant." *See* Docket No. 213 at 11. There are instances where the duration of confinement in administrative segregation alone was deemed to create a liberty interest. *See Payne v. Friel*, 266 F. App'x 724, 728 (10th Cir. 2008) (finding duration of confinement by itself may be an "atypical and significant hardship"); *Jordan*, 191 F. App'x at 651-53 (finding that long periods spent in administrative segregation could be atypical if not justified by sufficient extenuating circumstances); *see also Wilkerson v. Stalder*, 329 F.3d 431, 436 (5th Cir. 2003) (30 years in lockdown – 23 hours a day in isolation – *might* give rise to a

Sandin "atypical and significant" hardship); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (finding that an inmate in administrative custody for eight years, confined to his cell 23 hours a day, five days a week, and 24 hours a day, two days a week, with contact only with guards implicates a liberty interest); *Fogle v. Pierson*, 435 F.3d 1252, 1259 (10th Cir. 2006) (reversing district court's dismissal of complaint as frivolous where court concludes that there was no arguable basis that a three-year period of administrative segregation where prisoner was in his cell all but five hours a week and denied outdoor activities, was not "atypical").  However, in this case, "the duration of plaintiff's confinement does not sufficiently distinguish the length of his administrative segregation from *Jordan* (five years), *Georgacarakos* (seven), and *Rezaq* (thirteen years)." *Silverstein v. Federal Bureau of Prisons*, No. 07-cv-02471-PAB-KMT, 2011 WL 4552540, at *14 (D. Colo. Sep. 30, 2011).

### 5.  Conclusion

In sum, the Court concludes that there is nothing about the nature of the review process or the duration to date, when weighed against the other factors, that imposes an "atypical and significant" hardship.  Therefore, plaintiff has failed to plausibly allege a liberty interest which has been interfered with by the government.  *Cf. Saleh v. Federal Bureau of Prisons*, Nos. 05-cv-02467-PAB-KLM, 06-cv-01747-PAB-KLM, 07-cv-00021-PAB-KLM, 2010 WL 5464295, at *13 (D. Colo. Nov. 23, 2010) ("Arguably, given the recent jurisprudence in this District on this issue, an ADX inmate's conditions of confinement claim can no longer survive a motion to dismiss unless those conditions deviate substantially from those at issue in the prior cases."), *accepted by* 2010 WL

5464294 (D. Colo. Dec. 29, 2010); *see also McMillan*, 813 F. Supp. 2d at 1262.

Because plaintiff has failed to adequately allege an infringement upon a liberty interest,

the Court need not turn to the second step of the procedural due process analysis, i.e.,

addressing the adequacy of the process.  *See Templeman v. Gunter*, 16 F.3d 367, 370

(10th Cir. 1994).

## IV.  CONCLUSION

    For the foregoing reasons, it is

    **ORDERED** that defendants' motion to dismiss [Docket No. 203] is GRANTED in

part and DENIED in part.  It is further

    **ORDERED** that plaintiff's motion to strike [Docket No. 214] is DENIED as moot.

It is further

    **ORDERED** that plaintiff's claims for violation of the Fifth Amendment are

dismissed.  It is further

    **ORDERED** that plaintiff's claims for violation of the First Amendment, to the

extent they are based on the infringement of his free exercise rights, are dismissed.


    DATED March 15, 2012.

                                        BY THE COURT:


                                         s/Philip A. Brimmer
                                        PHILIP A. BRIMMER
                                        United States District Judge